# In the United States Court of Federal Claims

No. 18-1241C
(Filed: October 10, 2018)
(Re-filed: October 31, 2018)[1]

* * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| BTR ENTERPRISES OF SC, LLC, | Bid protest; pre-award bid protest; 28 U.S.C. § 8127 (2018); 38 C.F.R. Part 74 (2018); SDVOSB verified status; control. |
| *Plaintiff*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant.* | |

* * * * * * * * * * * * * * * * * * * * * * * * *

*Joseph A. Whitcomb*, Denver, CO, for plaintiff, with whom was *Mark Wilson*.

*Eric P. Bruskin*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, for defendant. *Steven Devine* and *Patrick Turner*, U.S. Department of Veterans Affairs, Office of General Counsel, of counsel.

OPINION

BRUGGINK, *Judge*.

This is a pre-award bid protest by BTR Enterprises of SC, LLC ("BTR"), of the Department of Veteran Affairs ("VA") decision to cancel BTR's verified status in the Center for Veterans Enterprise ("CVE") database

---

[1] This opinion was originally issued under seal. The parties did not propose redactions and therefore this opinion is reissued without redactions.

of service-disabled veteran-owned small businesses ("SDVOSB") after BTR had submitted a proposal responding to a VA solicitation.

On August 22, 2018, we denied plaintiff's motion for a preliminary injunction. The parties thereafter filed cross-motions for judgment on the administrative record. The matter is fully briefed, and we held oral argument on October 4, 2018. Because the VA did not abuse its discretion when it canceled BTR's verified status and because Mr. Roberts' subsequent plea agreement to a felony would preclude entry of an injunction, we grant defendant's motion for judgment on the administrative record and deny plaintiff's motion.

BACKGROUND

The Veteran Benefits, Health Care, and Information Technology Act of 2006, Pub. L. No. 109-461, § 502 (codified at 38 U.S.C. § 8127(a) (2018)), has as a goal an increase in contracting opportunities for small businesses "owned and controlled" by veterans and by veterans with service-connected disabilities. To be eligible for award of a set-aside contract, the small business and the veteran owner must be listed in a database of veteran-owned businesses maintained by the VA. 38 U.S.C. § 8127(e)-(f). To be eligible for listing in the database, the "small business concern owned and controlled by veterans" must be at least 51% owned by one or more veterans who control the "management and daily operations" of the business or one or more veterans whose service-connected disabilities are "permanent and total who are unable to manage the daily business operations." *Id.* § 8127(l)(2).

The applicable VA regulations, 38 C.F.R. Part 74 (2018), provide that a veteran seeking eligibility for set-aside contracts will file an "application for VetBiz VIP Verification status" through CVE's "Vendor Information pages database." 38 C.F.R. § 74.10 (2018). CVE reviews and evaluates VetBiz VIP Verification applications. *Id.* § 74.11(a).

The regulations define "service-disabled veteran-owned small business concern" as a business at least 51% of which is owned by one or more service-disabled veterans and "the management and daily business operations of which are controlled by one or more service-disabled veterans, or in the case of a veteran with a permanent and severe disability, a spouse or permanent caregiver of such veteran." *Id.* § 74.1. To be eligible for verified status, the business must be "owned and controlled by one or more veterans,

service-disabled veterans or surviving spouses. . . ." *Id.* § 74.2(a). The veteran also "must have good character." *Id.* § 74.2(b).

The VA has detailed regulations regarding the meaning of "control." "Control means both the day-to-day management and long-term decisionmaking authority for the VOSB." *Id.* § 74.4(a). Since many persons involved in a business may be considered to have a managerial role, "CVE will consider the control potential of such key employees on a case-by-case basis." *Id.* Additionally, "CVE regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations." *Id.* § 74.4(b). The SDVOSB must be controlled by eligible persons "who possess requisite management capabilities." *Id.* § 74.4(c). "One or more veterans or service-disabled veteran owners who manage the applicant or participant must devote full-time to the business during the normal working hours of firms in the same or similar line of business." *Id.*

Section 74.4(g) covers the extent to which non-veterans may be involved in management and day-to-day operation of the business. It states, "With the exception of a spouse or personal caregiver who represents a severely disabled veteran owner, no such non-veteran or immediate family member may: (1) exercise actual control or have the power to control the applicant or participant. . . ." *Id.* This provision is consistent with the statutory and regulatory definition of SDVOSB. Additionally, section 74.4(i) provides, "[n]on-veterans . . . may be found to control or have the power to control in any of the following circumstances, which are illustrative only and not all inclusive: . . . (4) Business relationships exist with non-veterans or entities which cause such dependence that the applicant or participant cannot exercise independent business judgment without great economic risk."

CVE may ask for clarification of information submitted by applicants. The applicant has the duty to inform CVE of "changed circumstances that could adversely affect its eligibility for the program (i.e., ownership and control changes) during its application review." *Id.* § 74.11(d). If approved, the "participant receives an eligibility term of 3 years from the date of CVE's approval letter establishing verified status." *Id.* § 74.15(a). During that term, "[t]he participant must maintain its eligibility . . . and must inform CVE of any changes that would adversely affect its eligibility." *Id.* "CVE may initiate a verification examination whenever it receives credible information calling into the question a participant's eligibility as a VOSB." *Id.* § 74.15(c). CVE

may shorten the eligibility term by cancellation if the participant does not maintain eligibility throughout the term.

"A verification examination is an investigation by CVE officials, which verifies the accuracy of any statement or information provided as part of the VetBiz VIP Verification application process." *Id.* § 74.20(a). CVE examiners may verify that the SDVOSB "currently meets the eligibility requirements, and that it met such requirements at the time of its application. . . ." *Id.* "An examination may be conducted on a random, unannounced basis, or upon receipt of specific and credible information alleging that a participant no longer meets eligibility requirements." *Id.* "Examiners may review any information related to the concern's eligibility requirements including, but not limited to, documentation related to the legal structure, ownership and control of the concern." *Id.* § 74.20(b).

Should CVE determine that it can no longer verify the accuracy of application materials or that the SDVOSB no longer meets eligibility requirements, CVE may cancel the verification. "CVE may cancel the 'verified' status button for good cause . . . . Examples of good cause include, but are not limited to, the following:

> (1) Submission of false information in the participant's VetBiz VIP Verification application. (2) Failure by the participant to maintain its eligibility for program participation. (3) Failure by the recipient for any reason . . . to main ownership, management, and control by veterans, service-disabled veterans or surviving spouses. (4) Failure by the concern to disclose to CVE the extent to which non-veteran persons or firms participate in the management of the participant. . . .

*Id.* § 74.21(c)(1)-(4).

The section concludes, "The examples of good cause . . . are intended to be illustrative only. Other grounds for canceling a participant's verified status include any other cause of so serious or compelling a nature that it affects the present responsibility of the participant." *Id.* § 74.21(d).

CVE must send a written Notice of Proposed Cancellation Letter, setting out "the specific facts and reasons for CVE's findings." *Id.* § 74.22(a). The participant has thirty days to submit a written response. The CVE Director will consider any information the participant submits. If the director

determines cancellation is warranted, CVE will issue a Notice of Verified Status Cancellation that explains the "specific facts and reasons for the decision." *Id.* § 74.20(c).

With that regulatory context, we turn to plaintiff, BTR, a South Carolina limited liability company. Brian Roberts submitted an application to CVE for verification of BTR as an SDVOSB on November 5, 2015. His application included the VetBiz Vendor Information Pages, resumes, BTR's operating agreement and articles of incorporation, and several letters of explanation.

On the Vendor Information Pages, Mr. Roberts affirmed that he read and understood 38 C.F.R. Part 74, that the business was owned and controlled by eligible persons, and that all of his statements were "true, correct, complete, and made in good faith." Administrative Record ("AR") 1. The first "Resume for BTR Enterprises of SC LLC" states that BTR "is 100% owned and controlled by Brian T. Roberts, a service disabled veteran." AR 2. On the last resume, Mr. Roberts states, "I manage and control 100% of BTR Enterprises of SC LLC. I manage all aspects of the business including the day to day operations as well as all financial decisions." AR 6. In one of the letters of explanation, Mr. Roberts states, "Brian Roberts works for BTR Enterprises of SC LLC on average 40 hrs per week." AR 34. The application materials make no mention of Mr. Roberts receiving assistance from anyone in running BTR.

CVE performed an initial examination of BTR's application and an examiner recommended that CVE approve BTR's application. The examiner noted that Mr. Roberts' application satisfied the definition of control in section 74.4. The examiner relied on the resumes, operating agreement, articles of incorporation, and letters of explanation to conclude that "it appears that Brian Roberts is controlling the day-to-day operations of the applicant." AR 79. The examiner wrote that, due to Mr. Roberts 40-hours per week representation, "the Service-Disabled Veteran is devoting full time management to the applicant." AR 80. Regarding control by non-veterans, the examiner stated, "There are no indications that the applicant is unable to stand on its own without undue influence from or dependency on a non-Veteran or other entity . . . ." AR 83. CVE notified Mr. Roberts on December 22, 2015, that CVE was adding BTR to the database as a certified SDVOSB. CVE informed Mr. Roberts that BTR "must inform CVE of any changes or other circumstances that would adversely affect its eligibility." AR 87.

In November 2016, Mr. Roberts was charged with perpetrating a scheme and artifice to defraud relating to VA disability benefits, obstruction of justice, and witness tampering. AR 134-143. CVE obtained a copy of this indictment.[2]

On March 7, 2017, Special Agents from the VA's Office of Inspector General ("OIG") visited Mr. Roberts' residence and interviewed him. The interviewing agents wrote a memorandum of the interview on March 15. AR 89-91. The Special Agents' notes relate that they introduced themselves and showed Mr. Roberts their credentials, and he agreed to be interviewed. AR 89. Mr. Roberts told them "he had last worked in approximately 2009." AR 90. Mr. Roberts stated that "most days he did not want to get out of bed and when he did he couldn't concentrate and that is why his companies all failed." *Id.* He also stated that "he was unable to 'maintain substantially gainful employment' and has not worked or had any income since 2009." *Id.*

When asked about BTR's performance of VA set-aside contracts, Mr. Roberts stated that "he never worked alone and would be unable to fulfill those contracts without the assistance of his wife, his mother and his father." *Id.* He further explained that "obtaining those set-aside contracts did not mean he could work because he couldn't complete the contracts without the help of his wife and father." *Id.* The memorandum concludes that Mr. Roberts told the agents that "he was unable to work due to PTSD and cannot run a company and his prior companies failed due to his inability to 'maintain substantial gainful employment.'" AR 91.[3]

---

[2] In December 2017, a superseding indictment followed, charging Mr. Roberts, among others, with violating federal criminal statutes by submitting false and fraudulent documents to the VA that misrepresented Mr. Roberts' service-related disabilities; as a publicly available document, the government attached this indictment to its brief. We do not consider the superseding indictment, as it was not the indictment CVE relied on in its notice and cancellation.

[3] On June 26, 2017, the VA held a hearing regarding Mr. Roberts' disability rating. During the hearing, Mr. Roberts' counsel stated, "The reason . . . that Ms. Roberts is present is that her testimony would demonstrate that she's instrumental in the ruining [sic] of the company." AR 94. Mr. Roberts stated during the hearing that his wife "performs the oversight mostly." AR 106. His wife is referred to as project manager or employee. *Id.* The government represents that CVE had a copy of this briefing at the time of its verification

Following the indictment and interview, CVE issued a Notice of Proposed Cancellation to BTR on May 23, 2018. CVE informed BTR that it had "confirmed that Mr. Roberts has valid Service-Disabled Veteran status from VA; however, CVE is unable to conclude that [BTR] satisfied the requirements set forth in" 38 C.F.R. Part 74. AR 149.

CVE stated three reasons that it could not conclude BTR was eligible for verified status. First, CVE stated that Mr. Roberts' indictment was evidence that Mr. Robert had not maintained the required "good character." Second, CVE stated, "[a]ccording to recent statements made by the SDV Mr. Roberts, [the VA] has become aware that the SDV has been unable to work and hat [sic] he would not be able to operate his businesses without the assistance of his wife, his mother, and his father." AR 150. CVE considered those statements evidence that Mr. Roberts did not control BTR in accordance with the requirements of section 74.4, specifically that he did not manage BTR's day-to-day operations, contrary to his prior assurances.

Third, CVE concluded from those same statements that BTR might be in violation of section 74.4(i)(4). CVE could not reasonably conclude that Mr. Roberts managed BTR "as a result of SDV Mr. Roberts' indication that he relies on the assistance of his wife, mother, and father to operate his businesses." AR 150. CVE therefore could not ascertain whether without non-veterans BTR would be viable or if Mr. Roberts' dependence on non-veterans interfered with his independent business judgment.

CVE proposed to cancel BTR's verified status for good cause based on submission of false information in BTR's application, failure to maintain eligibility, failure to maintain ownership, management, and control by the service-disabled veteran, and failure to disclose the extent to which non-veterans managed BTR. *See* 38 C.F.R. § 74.21(c)(1)-(4). CVE elaborated, "[T]he SDV has indicated that he relies upon the assistance of several non-Veteran persons to operate his businesses. This information was not disclosed to CVE during the verification of [BTR] as required by 38 CFR § 74.21(c)(4), and as such, CVE cannot reasonably determine whether the participant submitted false information in its verification application . . . ."

---

examination and cancellation of BTR's verified status. CVE notice and cancellation letters do not cite to this hearing, however. BTR, in its briefing, cites to Mr. Roberts' statements during that hearing to support its arguments. *See* Pl.'s Mot. J. Admin. R. 10, 12.

7

AR 151. CVE informed Mr. Roberts that BTR had thirty days "to provide sufficient evidence to CVE refuting the information identified and explaining why the proposed ground(s) should not justify cancellation." *Id.*

BTR responded to the notice letter on June 22, 2018, within the thirty day response period. Counsel for BTR argued in BTR's response letter, first, that an indictment is "nothing more than a federal accusation which is unproven," and is not sufficient grounds to cancel verification for failure to meet the good character requirement. AR 154. Next, BTR asserted that statements regarding Mr. Roberts' inability to work and his family's involvement in managing BTR were "taken out of context." *Id.* BTR argued that "no one in the family has much of anything to do with the business . . . The day to day management, long term decision making, and control all rests with Brian, the SDV." AR 155. BTR stated that Mr. Roberts' wife "provides emotional and moral support," that Mrs. Roberts "is the only family member . . . who has anything to do with BTR," and that his parents "do not have anything to do with BTR." AR 156. BTR contended in its response to the notice letter that CVE's stated reasons for cancellation were insufficient to constitute good cause and, thus, that CVE should not cancel BTR's verified status.

On or about August 10, 2018, the VA issued Combined Synopsis/Solicitation Notice 36C10E18Q9418, seeking quotes for the removal of mobile filing cabinets and floor tracks from a building. AR 163. The solicitation was a 100% set aside for SDVOSBs. The deadline for quotes was August 20, 2018. The VA anticipated making award by August 31, 2018. BTR submitted a proposal and was the only bidder.

On August 13, 2018, CVE issued its Notice of Verified Status Cancellation to BTR. CVE stated that it could not conclude that Mr. Roberts met the good character requirement, the control requirement of managing day-to-day operations, or the requirement that non-veterans not exert undue influence over the service-disabled veteran. Regarding good character, CVE stated that it had "ample regulatory support for CVE to consider an indictment" and then cited to FAR § 9.407-2(b) (2018), which provides the procedure for contractor suspension.

CVE explained that it based its conclusion that Mr. Roberts did not maintain day-to-day operation of BTR and that non-veterans exerted too much control over BTR on Mr. Roberts' "recent statements" that "he would not be able to operate his businesses without the support of his wife, his

8

mother, and his father." AR 160. CVE stated that those statements were not taken out of context or made in confidence, because they were voluntarily made to the OIG Special Agents. CVE relied on Mr. Roberts' statements that he had not worked since 2009 and that without his family's involvement he could not have performed BTR's set-aside contracts. CVE cited the same grounds for cancellation as set out in the notice, 38 C.F.R. § 74.21(c)(1)-(4). CVE notified BTR that it had canceled its verification effective immediately.

BTR filed the pending bid protest on August 20, 2018. On October 3, 2018, the government filed a notice of two events that occurred after briefing concluded. First, the government's notice reports that Mr. Roberts pled guilty on October 2, 2018, to conspiracy to defraud the VA in violation of 18 U.S.C. § 371 (2018). Second, the government reported that, on September 28, 2018, the VA notified BTR and Mr. Roberts that they have been suspended from contracting with the federal government pursuant to FAR Subpart 9.4 and Veterans Administration Acquisition Regulation Subpart 809.4.

## DISCUSSION

The court may, and does, take judicial notice of Mr. Roberts' guilty plea in connection with criminally defrauding the VA, which is a publicly available document filed in the United States District Court for the District of South Carolina. *See* Fed. R. Evid. 201. In light of his guilty plea, we first discuss the relief that BTR seeks. Even if plaintiff could show a violation of federal procurement law in canceling BTR's verified status, we must determine whether an injunction is appropriate. The fourth factor that the court must consider when determining whether to issue an injunction is whether it is in the public interest to grant the requested relief. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Mr. Roberts' guilty plea puts paid to any suggestion that BTR should be eligible to receive this VA contract. It is clearly not in the public interest for VA to award contracts to a business owned by someone guilty of conspiring to defraud the VA, the same agency from which he seeks a contract award. In light of Mr. Roberts' guilty plea as well as the suspension of BTR from government contracting, none of the other injunctive factors would be sufficient, even if they favored plaintiff, to allow injunctive relief.

Nevertheless, we go one to examine plaintiff's claim on the merits. Even in the absence of the plea agreement, CVE did not violate the law, abuse its discretion, or otherwise act arbitrarily or capriciously in canceling BTR's verified status because it had a rational basis for concluding that Mr. Roberts

9

had submitted false information in his application materials regarding control of BTR. There is no dispute that the regulations permitted CVE to rely on the notes of the OIG Special Agents' interview with Mr. Roberts which plainly were inconsistent with the representations Mr. Roberts made to become eligible for award of set-aside contracts. Plaintiff stated that "he never worked alone and would be unable to fulfill those contracts without the assistance of his wife, his mother and his father," had not worked since 2009, and that "he was unable to work due to PTSD and cannot run a company," AR 89-91, which is at odds with the BTR application that states that Mr. Roberts managed "all aspects of the business including the day to day operations as well as all financial decisions" and worked "on average 40 hrs per week." AR 6, 34. Plaintiff's counsel suggests that these statements should not be taken out of context. We assume this is a polite way of saying that plaintiff should be given a pass for lying to the OIG Special Agents because he was concerned about not losing his VA benefits for being 100% disabled. We are unsympathetic.

Nor are we sympathetic with counsel's argument that it was unnecessary for plaintiff to lie in order to both be eligible for disability payments on a 100% disabled basis and *still* be eligible for contract awards.[4] Apparently that is correct.[5] Nevertheless, Mr. Roberts elected to base his

---

[4] BTR's statements regarding familial involvement have evolved since BTR responded to CVE's notice letter. Although the response stated that the family is not involved in managing the business, BTR states in briefing, "BTR is a family run business" and "has historically maintained that [Mr. Roberts] was able to run his business with his family's assistance." Pl.'s Mot. J. Admin. R. 7, 10. BTR also states, however, that a relationship between BTR and Mr. Roberts' parents "simply does not exist." *Id.* at 13. Plaintiff maintains that any of these versions of familial management are permissible under the regulations.

[5] BTR argues that CVE did not have good cause to cancel BTR's verification because section 74.4(g) excepts "a spouse or personal caregiver who represents a severely disabled veteran owner" from the prohibition on non-veterans or immediate family members exercising or having power to exercise actual control over the participant. This section complements 38 C.F.R. § 4.16(a), which, in the disabilities ratings context, permits "marginal employment," such as a "family business or sheltered workshop." As a spouse, Mr. Roberts' wife would fall within the section 74.4(g) exception. Nevertheless, BTR did not reveal Mrs. Roberts' involvement at the time of

VetBiz VIP Verification application on different representations, namely that he alone managed BTR and did so by working on average 40-hour weeks, without mentioning any familial aid. The fact that he did not need to lie to be eligible for verified status does not mean that he did not lie.

BTR's application made no mention of Mr. Roberts receiving any aid from his wife, mother, or father in the management of BTR. When presented with the opportunity to clarify these concerns in its response to the Notice of Proposed Cancellation, BTR did not clarify why the involvement of Mr. Roberts' family was not disclosed in the application. At the very least, CVE was presented with statements at the time of application that Mr. Roberts alone operated BTR. The OIG notes and the response to the Notice of Proposed Cancellation both present a different picture of which, how many, and to what extent non-veterans–not limited to Mr. Roberts' wife–controlled the operations of BTR. Reasonable confusion existed regarding who managed the business, and thus CVE's conclusion that BTR could not continue as a verified entity in the database was not arbitrary.

## CONCLUSION

Plaintiff has not succeeded on the merits, and, in any event, the public interest would preclude us from awarding plaintiff injunctive relief. We therefore grant the government's cross-motion for judgment on the administrative record and deny plaintiff's motion. The Clerk is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge

---

application or any point thereafter; nor did BTR reveal the involvement of any non-veterans who do not fall within the section 74.4(g) exception, such as Mr. Roberts' parents.